THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT TINOCO, Defendant-Appellant.

First District (2nd Division) No. 1—86—1502*

Opinion filed June 27, 1989.

*This case was assigned to the second division on April 10, 1989.

Randolph T. Stone, Public Defender, of Chicago (Donald Honchell, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and Linda Woloshin, Assistant State's Attorneys, of counsel, and Michael Brychell, Law Student), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

Defendant's appeal from his convictions for delivery of a controlled substance raises the issues of whether: (1) the State proved him guilty beyond a reasonable doubt; (2) exclusion of testimony of two defense reputation witnesses constitutes reversible error; (3) contradictions of record regarding the imposed fine warrants remandment for clarification; and (4) defendant's fine may be offset by time served in prison prior to sentencing.

Following a bench trial, the circuit court found defendant guilty of three counts of delivery of a controlled substance (Ill. Rev. Stat. 1987, ch. 56½, par. 1401) upon the theory of accountability (Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c)), imposed a fine of $3,000, and sentenced defendant to six years in custody of the Department of Corrections.

At trial, Drug Enforcement Administration (DEA) agent Robert Fanter testified to three separate transactions involving defendant and codefendant Gil Cobian.[1]

On August 28, 1984, Fanter telephoned Cobian at the Cedar Hotel in Chicago and asked for a meeting which took place at a McDonald's restaurant adjacent to the hotel. When Fanter told Cobian that he wanted to buy cocaine, Cobian replied that he would call Fanter after he had "talked to his source." Cobian called Fanter two days later and said his source was with him; he, Cobian, had an ounce of cocaine for sale; and Fanter should come immediately to the hotel. Following Cobian's instructions, Fanter and another DEA agent, Anthony Greco, went to the Cedar Hotel. Greco remained in their car as Fanter went into the hotel alone. In Cobian's room, Fanter saw Cobian

---

[1]Cobian too was charged with three counts of delivery of a controlled substance. Defendant successfully moved for severance, and the court conducted concurrent but separate trials.

and defendant, who Cobian referred to as "Joe." Cobian gave Fanter a clear plastic bag containing white powder, for which Fanter handed him $2,400 in prerecorded, DEA funds. Fanter told defendant that he would be interested in "doing some in the future." Defendant responded that "it would be possible to do larger amounts in the future."

When Fanter next contacted Cobian on September 10, 1984, by telephone and asked to purchase two ounces of cocaine later in the week, Cobian said he would "get a hold of his source and make arrangements for the delivery." Cobian did not identify his source by name. Fanter placed two more phone calls to Cobian on September 12, and twice that day went to the Cedar Hotel to meet Cobian. Greco again accompanied Fanter and again remained in the car. On his second visit, Fanter found both defendant and Cobian in the room. Cobian gave Fanter a clear plastic bag containing white powder. Fanter remarked that he hoped the quality of the cocaine would be better than before. Defendant said "it was better than the time before." Cobian took $2,400 in prerecorded, DEA bills from Fanter and handed it to defendant, who put it in his front trouser pocket. Defendant also stated that if Fanter purchased larger amounts in the future, "the price would go down."

Fanter placed another call to Cobian on September 18, 1984, arranged to meet him later that day at the same McDonald's restaurant and noted that he was interested "in doing larger amounts," anywhere from 10 ounces to a kilogram. Cobian responded that he'd have to speak to his source, referred to as "Joe." Fanter telephoned Cobian on September 26 and again on September 27; Cobian informed him the second day that his source had not yet arrived and that Fanter should call one hour later. When Fanter did so, Cobian said his source was with him and that Fanter should "come right over." Fanter drove with Greco to the hotel and, while Greco waited outside, proceeded alone inside the building.

In Cobian's room, Fanter again found Cobian and defendant. Cobian handed Fanter two clear plastic bags containing white powder. Defendant assured Fanter that the "two ounces were better than the one ounce [Fanter] purchased earlier." Fanter examined the cocaine under a light and handed $4,800 in prerecorded bills to Cobian, which he in turn gave to defendant. Defendant placed the bills in a trouser pocket. In response to Fanter's remark that he "wanted to do larger amounts," defendant stated that he "could deal more in the future, but he had to get to know [Fanter]." He also told Fanter the price of the narcotics would improve.

Fanter returned to his car and waited with Greco until defendant and Cobian emerged from the hotel. The agents followed the car in which defendant and Cobian drove away from the building; Fanter did not participate in their subsequent arrest.

Following defendants' arrests that day, Fanter spoke to Sergeant Killackey at the 11th and State police station in Chicago. Killackey told Fanter that defendant wished to speak to Fanter and Killackey alone. In Killackey's office, Fanter read defendant his constitutional rights, after which defendant said he received cocaine from an individual who owned or had owned an auto body shop at 22nd and Western and that he owed that individual $4,400 for the two ounces Fanter purchased earlier that day. If defendant could pay the $4,400, he could possibly purchase more cocaine. When Fanter refused to give him the money, defendant became upset and declined to speak any more.

On cross-examination, Fanter admitted that "original information" given to him indicated that Cobian and a person named Victor Romo were involved in drug trafficking; during the course of the transactions described above, Fanter at no time heard the name Robert Tinoco; and Cobian never identified "his source" as Robert Tinoco. Fanter did not see Cobian hand any money to defendant on August 30. On September 12, only Cobian, not defendant, pointed out the plastic bag of white powder to Fanter and referred to it as Fanter's "ounce." Fanter further conceded that he never saw defendant handle the cocaine bags and that he did not know what time defendant arrived at Cobian's room on September 12. No trace of defendant's fingerprints was found on the cocaine bags received on the 12th and 27th of September, nor did defendant tell Fanter at the police station on September 27 that the cocaine seized was his. In a conversation with Cobian on August 8, 1984, Cobian assured Fanter he could deliver large amounts of cocaine to him, but would have to talk to "Joe" to secure them.

Greco's testimony corroborated Fanter's description of his activities in connection with the cocaine transaction, specifically stating that on August 30, September 12 and September 27, Fanter and Greco parked their car in front of the hotel; Fanter walked into the hotel for approximately 10 minutes and reappeared carrying plastic bags of white powder, and on each occasion, the agents subjected the powder to a field test, which proved positive for the presence of cocaine. After the final transaction on September 27, Greco and Fanter waited in their car until defendant and Cobian left the hotel, following them once they drove away in their own automobile. In all the times he accompanied Fanter, he never saw where Fanter went once he en-

tered the hotel.

On September 12, DEA agent Donald Imburdino drove with another agent to the Cedar Hotel and parked his car in front of the building. Upon surveillance, Imburdino saw Fanter enter and leave the hotel twice. Shortly after the completion of Fanter's second visit, Imburdino watched as defendant left the building and entered a nearby, parked white Oldsmobile containing a woman and a small child. Imburdino followed defendant as he drove to a restaurant, an ice cream parlor, a Shell gas station and then "Mechanics Expert Auto Body" on 22nd Street, one half block west of Western Avenue. At the last stop, defendant got out of his car, walked into the building, returned a couple of minutes later and proceeded to a residence on Hermitage Street, which he and his companions entered.

On September 27, Imburdino, again waiting in a parked car, saw Fanter leave the hotel. Shortly thereafter defendant and Cobian emerged and drove away in an "older Buick" to 47th and Aberdeen Streets, where they were arrested by Imburdino and other agents. Imburdino searched defendant incident to his arrest and found $4,500 in his trouser pocket. Other agents recovered $300 from Cobian. Imburdino averred he never met Cobian or defendant before September 27 or saw Fanter and Cobian meet or leave the hotel together. He knew defendant's name prior to his arrest.

Killackey testified he was present at 11th and State following defendant's arrest on September 27. Defendant told Killackey he wanted to speak to Fanter and Killackey alone. Once in Killackey's office, Fanter informed defendant of his constitutional rights. Defendant thereafter told the officers that he owed $4,400 to a man who owned a body shop at 22nd and Western, and if the authorities gave defendant $4,400, he could repay his debt and then "do something good" for Killackey and Fanter. Fanter declined to give any money to defendant and defendant refused to say anything else.

The surveillance team in front of the Cedar Hotel on September 12 included DEA agent Dale Knittel, who swore that when defendant drove away from the hotel, he followed in his own car and concurred with Greco that defendant made several stops that afternoon, including one at an auto body shop at 22nd Street. On September 23, Knittel recorded the serial numbers and dates of the currency used in Fanter's September 26 drug purchase. Knittel also assisted in the arrest of defendant and Cobian at 47th and Aberdeen. He searched Cobian incident to the arrest and found on him three $100 bills with serial numbers matching the numbers Knittel recorded several days before. The 45 $100 bills retrieved by Imburdino from defendant and

subsequently delivered to Knittel also matched the numbers recorded previously. Knittel stated that prior to defendant's arrest, Knittel knew defendant only as "Joe." Both before and after defendant's arrest, Knittel averred, Fanter told him the details of the September 27 transaction.

Cobian testified he and defendant were childhood friends and that they saw each other two or three times per month. Because he was "on disability" and "didn't receive much money," Cobian borrowed money from defendant "sometime during 1984." On the three occasions Fanter came to Cobian's room at the hotel and found defendant with Cobian, defendant was there only to collect money Cobian owed him; Cobian also said he invited defendant to his room because he was afraid of Fanter and "didn't know what he would do." Cobian averred he received the cocaine delivered to Fanter from an individual known only as "Oscar" and that he purchased the drugs "on credit." He admitted introducing defendant to Fanter as "Joe," but only because defendant's real identity was "none of [Fanter's] business." At no time did defendant bring Cobian drugs, encourage Cobian to sell drugs to Fanter, or assist Cobian in completing such a transaction. Defendant warned him that he "should be careful."

Cobian denied telling defendant immediately before or after August 30, September 12 or September 27 that he intended to deal drugs with anyone and further denied hearing defendant converse with Fanter and telling Fanter that defendant was his source for narcotics. Cobian insisted he never heard defendant tell Fanter that on August 30 defendant could obtain a kilo of cocaine for him, or on September 12 that he wanted to get to know Fanter better and could deliver larger amounts of cocaine to him, or on September 27 future deliveries would be better than what Fanter received in the past. Cobian never heard defendant make any statements to Fanter concerning price or quantity of the cocaine. When Fanter attempted to speak to defendant regarding the cocaine on September 12, defendant maintained he "[knew] nothing about that," and that Fanter should "talk to Gil." Cobian conceded he received money from Fanter, but claimed he kept $200 for himself on August 30 and September 12 and $300 on September 27, and never gave any of that money to defendant in front of Fanter.

After their arrest on September 27, defendant and Cobian travelled in the same car to the police station and were together continuously until Killackey and "somebody else came and got [defendant] from where we were together and took him away" to an unknown destination. Defendant did not ask to speak to Killackey or any other

officers prior to their separation at the station.

## I

Defendant initially urges reversal of his convictions because the State failed to prove him accountable for Cobian's delivery of a controlled substance.

■ Guilt by accountability demands proof beyond a reasonable doubt that defendant: (1) solicited, ordered, abetted, agreed or attempted to aid another in the planning or commission of a crime; (2) participated before or during the commission of the crime; and (3) possessed concurrent, specific intent to promote or facilitate the offense. (*People v. Soteras* (1987), 153 Ill. App. 3d 449, 454, 505 N.E.2d 1134; *People v. Schlig* (1983), 120 Ill. App. 3d 561, 570, 458 N.E.2d 544.) Defendant's mere presence at the crime scene and knowledge of an ongoing offense is not, alone, sufficient to establish accountability (*People v. Deatherage* (1984), 122 Ill. App. 3d 620, 624, 461 N.E.2d 631; *People v. Schlig*, 120 Ill. App. 3d at 570); nevertheless, the fact finder may infer defendant's accountability from his approving presence at the scene of the crime (*People v. Fuller* (1980), 91 Ill. App. 3d 922, 929, 415 N.E.2d 502), and from evidence of conduct showing a design on defendant's part to aid in the offense. *People v. Schlig*, 120 Ill. App. 3d at 570.

■ The record evidence here demonstrates that defendant's position transcended that of a mere observer. He was present in Cobian's room each time Fanter visited Cobian to purchase narcotics. He assured Fanter on September 12 that he had received better quality drugs than before. On August 30, September 12 and September 27, defendant also asserted the quantity of cocaine sold to Fanter would similarly increase. These statements, combined with Fanter's testimony that Cobian handed the prerecorded $100 bills directly to defendant in Fanter's presence, defendant's insistence that he get to know Fanter better before Fanter could receive greater portions of the drugs, and Cobian's reference to defendant and his source as "Joe" amply support not only the conclusion that defendant aided and abetted Cobian with the requisite felonious intent, but also that defendant supplied Cobian with the narcotics.

■ Attempting to portray his presence at the hotel as innocent and inconsequential, defendant relies on Cobian's testimony that Fanter and defendant never spoke to each other in Cobian's presence; defendant never supplied Cobian with narcotics or encouraged Cobian to engage in illegal activity; and defendant visited Cobian's room merely to collect money borrowed by Cobian. The circuit court, how-

ever, found the State's witnesses more credible and that the evidence weighed convincingly in the State's favor; because no reasonable doubt of guilt emerges from the record, this court must accept the circuit court's findings. (*People v. Berland* (1978), 74 Ill. 2d 286, 305-06, 385 N.E.2d 649.) Proof that defendant actively participated in the commission of an overt act constituting the offense, furthermore, is unnecessary. (*People v. Bernard* (1986), 149 Ill. App. 3d 684, 690, 500 N.E.2d 1074; *People v. Schlig*, 120 Ill. App. 3d at 570.) The facts related at trial establish defendant's approving presence at the crime, conduct which the court may consider in combination with other circumstances and conclude that defendant assented to the offense, and thereby aided and abetted it. *People v. Bernard*, 149 Ill. App. 3d at 691-92.

Additional confirmation of defendant's accountability may be inferred from defendant's statements to Fanter and Killackey after defendant's arrest. Testimony concerning defendant's remarks in Killackey's office did not harmonize completely, yet witnesses did concur that defendant drove on September 12 to an auto body shop at 22nd and Western Streets; defendant told the officers on September 27 that he needed $4,400 to pay the owner of an auto body shop at 22nd and Western; and if police supplied him with the money, defendant could do something for them in return. Viewed in a light most favorable to the State, the record evidence would support any rational trier of fact in finding the essential elements of the crime proved beyond a reasonable doubt. *People v. Valen* (1989), 183 Ill. App. 3d 571, 577.

*People v. Valen* (1989), 183 Ill. App. 3d 571, 577, reinforces this conclusion. The *Valen* court affirmed defendant's conviction for delivery of a controlled substance upon a theory of accountability based on proof that defendant: (1) was present on the two occasions an undercover agent purchased cocaine from a third party; and (2) spoke twice to the officer on the telephone, admonishing him to "be patient" and "hang in there" when the agent expressed concern that a promised delivery of cocaine would not be realized. In the instant case, defendant not only was present when Fanter purchased the cocaine but also, as noted above, directly addressed the quality and quantity of future purchases, collected funds used to buy the drugs and "coincidentally" appeared whenever Cobian told Fanter his "source" was in his room.

We decline defendant's invitation to follow *People v. Deatherage* (122 Ill. App. 3d 620). In *Deatherage*, the court reversed defendant's conviction for delivery of a controlled substance, ruling that his mere presence at the scene of the drug sale and reference by a third party to the defendant as his "guy," meaning his source, was insufficient to

hold the defendant accountable for illegal activity. Admittedly, Fanter in the instant case testified the Cobian referred to defendant often as "his guy," yet, unlike *Deatherage*, the record here also demonstrates that Cobian identified his source on August 8 as "Joe" and on August 30 introduced defendant to Fanter as "Joe."

## II

Defendant next maintains that exclusion by the circuit court of two reputation witnesses because he failed to identify them before trial denied him his constitutional right to compulsory process and thus entitles him to a new trial.

■ Imposition of sanctions for discovery violations lies within the circuit court's discretion and will be disturbed only where proven prejudicial to defendant. (*People v. Flores* (1988), 168 Ill. App. 3d 284, 293, 522 N.E.2d 708.) Our courts express a preference for recess and continuance when defendant tenders evidence not previously disclosed to the State (*People v. Carrasquillo* (1988), 174 Ill. App. 3d 1023, 1032, 529 N.E.2d 603; *People v. Flores*, 168 Ill. App. 3d at 293), but will tolerate exclusion in the face of a wilful omission "motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence." *Taylor v. Illinois* (1988), 484 U.S. 400, 415, 98 L. Ed. 2d 798, 814, 108 S. Ct. 646, 655; *People v. Carrasquillo*, 174 Ill. App. 3d at 1031.

At bar, defense counsel asked the circuit court, at the close of the State's case, to allow the presentation of two reputation witnesses, Ben Balmares and Soleded Vasquez, who defendant asserted in his offer of proof would testify as to his reputation in the community for lack of involvement with narcotics. The court denied defendant's request, yet allowed Cobian's attorney to introduce testimony of an occurrence witness, whose existence Cobian's counsel brought to the court's attention the same day defendant moved to amend his own answer to discovery.

■ Defendant notes nearly one month elapsed between his motion to amend his answer to discovery and when defendant actually began presentation of his case, providing ample time in which to interview the proposed witnesses and prepare for their testimony. This court previously has found the sanction of exclusion an abuse of the circuit court's discretion where the State had "ample opportunity" to interview the proposed witnesses (see *People v. Flores*, 168 Ill. App. 3d at 293); however, the nature of the witnesses defendant here asked to introduce and the timing of his request weigh in favor of exclusion.

In *Taylor v. Illinois*, the United States Supreme Court approved the exclusion of an occurrence witness whom defense counsel brought to the court's attention on the second day of the State's case. Defendant's offer of proof concerning the witness' testimony demonstrated the witness: (1) did not see the incident in question, but rather saw the defendant and his victim immediately before the crime; and (2) had never actually met the defendant until after commission of the alleged crime. (*Taylor v. Illinois*, 484 U.S. at 404, 98 L. Ed. 2d at 807-08, 108 S. Ct. at 650.) Here, defendant waited until the end of the State's evidence to raise the existence of the character witnesses, one of whom was defendant's neighbor and the other a friend acquainted with defendant since childhood, which recalls the *Taylor* court's conclusion that "there is something suspect about a defense witness who is not identified until after the eleventh hour has passed." (*Taylor v. Illinois*, 484 U.S. at 414, 98 L. Ed. 2d at 814, 108 S. Ct. at 655.) Defendant's defense in the case *sub judice* turns on the theory that his presence in Cobian's hotel room, his receipt of DEA currency and statements he made concerning the cocaine were entirely inculpable acts misconstrued by the State as evidence of illegal activity; nevertheless, having heard the State's evidence in full, defendant's belated production of witnesses willing to provide testimony filling the contours of this theory is, at the very least, suspicious and demonstrates a wilful disregard for rules governing discovery. See 107 Ill. 2d R. 415.

Defendant argues that uncertainty surrounding the character witnesses' willingness to appear in court precluded earlier disclosure of their names. In *Taylor*, however, the Supreme Court rejected defendant's insistence that his inability to locate his witnesses made disclosure of their names impossible and implicitly accepted instead the circuit court's assertion that defendant knew the witnesses' names and therefore should have revealed that information to the State, even if their addresses were unknown. See *Taylor v. Illinois*, 484 U.S. at 404, 98 L. Ed. 2d at 807, 108 S. Ct. at 650.

At bar, defendant's response to the State's discovery request listed Cobian, defendant, and defendant's wife as potential witnesses and further stated "Investigation continues." Representations of defense counsel to the court, however, suggest Balmares and Vasquez were known to defendant at an earlier date: "[W]e were *** talking to a lot of people finding out whether they were willing to come forward. Some people, although it doesn't affect them adversely, the fact they were coming into the courtroom. [*Sic*] We were finally able to from [*sic*] our discussions in talking to these people, were able to

learn at least two of the people were agreeable to come into court." Given the alleged length of the witnesses' acquaintance with defendant, defense counsel easily could have revealed their names in his answer to the State's request for discovery, even if ultimately they proved too reluctant to testify. See *Taylor v. Illinois*, 484 U.S. at 414, 98 L. Ed. 2d at 815, 108 S. Ct. at 656.

Defendant neglects to identify the prejudice, if any, visited upon him as a result of the court's ruling. The court below offered no comment on defendant's offer of proof regarding Balmares' and Vasquez' testimony; however, its exclusion of these witnesses, while permitting Cobian's newly found occurrence witness to testify, implies the court heard nothing in the offer of proof which, even if accepted as true, would dissuade it from its conclusion of defendant's guilt beyond a reasonable doubt. (*People v. Falconer* (1988), 168 Ill. App. 3d 618, 624, 522 N.E.2d 903; *People v. Flores*, 168 Ill. App. 3d at 294.) We note further that no offer was made as to defendant's good reputation that would have supported testimony of his lack of reputation for narcotics activities. (*People v. Partee* (1974), 17 Ill. App. 3d 166, 179, 308 N.E.2d 18; *People v. Thornton* (1978), 61 Ill. App. 3d 530, 534, 378 N.E.2d 198.) The circuit court did not err in excluding defendant's character witnesses.

### III

Defendant insists that, should this court affirm his convictions, this cause must be remanded to the circuit court to correct an ambiguity of record regarding the fine entered against him.

■ The order entered on May 8, 1986, in the instant case noted a $3,000 fine imposed on defendant. The order comports with a statement made *twice* by the court that it would impose a $3,000 fine on defendant "as representative of the street value" of the cocaine; however, on the same transcript page appears the court's statement, "Fine of $2000." The State contends that the circuit court intended a $3,000 fine and that the record suffers only from a "lack of clarity." We agree.

### IV

■ Defendant lastly contends that he is entitled to a credit of $5 per day for each day spent in custody prior to the entry of his sentence, provided this court affirms his convictions. Citing *People v. Seidel* (1985), 138 Ill. App. 3d 616, 621, 495 N.E.2d 1330, the State agrees that defendant's fine must be so reduced. (See Ill. Rev. Stat. 1987, ch. 38, par. 110—14.) The cause therefore must be remanded for

the purpose of reducing the fine by $1,180, reflecting defendant's 236 days in custody.

For the foregoing reasons, we affirm defendant's convictions and remand for adjustment of the fine entered against him.

Affirmed and remanded with directions.

SCARIANO and DiVITO, JJ., concur.